Case No. 221, Block 61, et al. Heating, Air-Conditioning, & Refrigeration Distributors International, et al. petitioners v. Environmental Protection Agency, and Michael S. Reagan, in his official capacity as Administrator of the U.S. Environmental Protection Agency. Mr. Worth, for the Association of Petitioners. Mr. D'Angelo, for the Petitioner Reporting Committee. Mr. Wilmington, for the Petitioner Initiative Committee. Mr. Koglein, for his comments. Mr. Worth, good morning. Good morning, Your Honors. May it please the Court. Stephen Worth, for the Association of Petitioners. I'll be addressing EPA's lack of statutory authority to regulate cylinders this morning. My colleague, Mr. D'Angelo, will be addressing our under-trained petitioners' agreements. The AMAC directs EPA to phase down the production and consumption of hydrofluorocarbons through an allowance allocation and trading program. But Congress did not grant EPA authority to regulate cylinders used to store and transport HFCs. Indeed, the Act never mentioned cylinders. Instead, EPA bases its entire cylinder regulating regime on two words, shall and should, found in Section E2B of the Act. According to EPA, these two words grant the agency essentially unlimited authority to devise what it calls complementary measures that the agency thinks will help it to enforce the phase-down by reducing sluggishness. The problem with EPA's petition is that Section E2B does not grant EPA any power to issue regulations at all. It doesn't say, shall by regulation ensure. Unlike all the other places where Congress has directed EPA to act by issuing regulations, Section E2B is different. It includes no rulemaking authority. And that lack of express rulemaking authority is, I think, very important because if Congress intended to give EPA broad authority to regulate cylinders to address smuggling, we would expect Congress to confer that power in the section of the Act that expressly grants EPA authority to enforce the phase-down. And that's in Section K. Section K is easy to overlook because it operates by incorporating Sections 113 and 114 of the Clean Air Act. But those provisions of the Clean Air Act give EPA extraordinary powers to detect, to interdict, and to punish smuggling, including by requiring advance notice and preclearance of all imports, by authorizing EPA to physically inspect records and premises, by granting EPA subpoena powers, and by authorizing EPA to bring administrative, civil, and criminal actions for violations of the AMAP, with penalties that range from revocation of allowances to civil monetary penalties to jail time. And for decades, EPA has run on those powers in order to combat smuggling of early refrigerant chemicals. Does the Clean Air Act enforcement authority confer on EPA under the AMAP authority to impose labeling requirements? No, I don't believe that it does. How about batch testing requirements, batch testing of blends, for example? I don't know off the top of my head. Auditing requirements? Potentially. The Clean Air Act General? Yes. How about transshipment rules? I believe it would as well. The Clean Air Act General? I believe so. And what about, there's some other alternatives raised by commenters and cited by the petitioners, things like certifying HFC packaging facilities, authentication programs, that kind of thing they would be under. I think all of those would be potentially available under the Clean Air Act, which is incorporated under the Clean Air Act, yes. But no labeling or batch testing. Subsection E2B is about actual consumption, including consumption under the phase-down amounts and the allowances, but also any other consumption, right? It talks about annual quantities produced or consumed. Yes, it does. And when Congress enacted the AIM Act, presumably it was aware that globally most countries had taken measures to limit HFCs. Yes, that's right. And many of the leading markets had also adopted refillable cylinder requirements. Yes, I think that's meaningful because Congress did not then go to adopt those requirements. It could have, but it didn't. And to be clear, Congress knows how to regulate these cylinders. In fact, Congress has authorized the Department of Transportation specifically to regulate exactly the design of the cylinders in question here. And the cylinders you're talking about, they're called DOT 39s because that's the DOT regulation that governs their design. Everything from the surface. It's a familiar kind of cylinder. Exactly. So the Congress that enacted this law was aware that there would be significant pressure of illegal marketing into the United States, given the markets that were closing down in other countries for HFCs. Everyone's dealing with potential circumvention. Well, other markets are, but I think other markets also have different methods of dealing with this type of circumvention. And I think Congress has dealt with that through the enforcement provisions of the Clean Air Act, which do give the EPA really substantial power to interdict smugglers. So there's enforcement, but the question of sort of separately compliance, anti-circumvention, I don't see that dealt with in this act, in the AMAC. Well, so I think there are a couple different ways that it does it. One is it allows you to punish after the fact. So you can punish after the fact, but it also does give the agency the authority to require pre-clearance and notification of all sorts of imports and shipments. And EPA, in the final rule, has in fact adopted measures by which all importers must give 14 days' notice to the agency and get pre-clearance for all of their imports. So that would be helpful, even with illegal importation, I guess, because if something comes in and it looks like HFCs, but it's not something that CBP was given advance warning of, that they could, it would be another way of sort of separating the illegal from the illegal. So you've not identified any authorization other than the General Clean Air Act enforcement regime for anti-circumvention measures. There just isn't any other provision in. No, there's not. No, there's not. No, that is telling. I think it's because Congress knew that the existing measures that EPA has are in fact quite powerful. And EPA has used these in the past in order to introduce smuggling of other refrigerants. And would it have made a difference, I heard you to be suggesting that it might have, if E2B had included authority to promulgate regulation? I think that would make a difference. I think you look at the act, and I would ask you all to read the act from top to bottom just to see how it all hangs together. Because I really do think that when you look at how all these provisions fit together, there are many instances where Congress has given the agency very express rulemaking authority to all manner of things, and E2B doesn't do that. Just to push back on that, though, Congress conferred regulatory authority under K1A to promulgate regulations to carry out the functions of the administrator, and in E2B described one of the administrator's functions to be that he shall ensure that annual quantities produced or consumed not exceed the applicable maximum. Why do you think they're telling EPA to expressly display any reliance on them? I didn't read it quite that way. I read them to say, you're talking about the response to comment where they said, you know, we're not relying on K1A for, I took it to be for the substantive, you know, scope of the regulatory authority that they're saying, look, we actually have a compliance provision in the AMAC that's entitled compliance that says we shall ensure that excess is not imported or manufactured or consumed, and so we're not relying on K1A there. Just to be very clear, putting waiver aside or putting this disclaimer aside, Section K is not a broad grant that sort of whatever it takes rulemaking authority. It does, it merely authorizes the agency to engage in gap-filling to implement aspects of the administrator's authority, and that's sort of, that's how this court treated a similar provision in ARAC in the Alabama power case, but I really don't think that the agency is relying on broad rulemaking authority in Section K. Now, I take it to be relying on Section K as providing what you pointed out to be the missing language in E2B that that is a duty of the administrator, function of the administrator expressly under the AMAC is to ensure that annual quantities produced or consumed don't exceed the applicable maxima, and then because that's a duty, if the administrator finds it, you know, a reasonable measure that would support that function, that that would be clearly within the agency's authority under K1A. I understand. I do want to, however, really talk about this, the use of the word challenge rule here. I think it's really important to understand how Section E2B functions in this regulatory scheme, in this statutory scheme. So Section E2B, I think, serves two roles, and the first and most important role is that this is the only section of the Act that sets out the aggregate production and consumption volume for all regulated substances under the Act and specifically describes how to calculate it by multiplying production consumption baseline by these declining percentages per year, and the resulting curve that you get from making those calculations, that is the phase-down. That really is for the Act, and this is the only section of the Act that actually describes it. As for the shall-ensure language, I think what that language clarifies is the primacy of the declining phase-out curve as a condition on all of the specific regulatory actions that the statute directs or authorizes EPA to take. So in other words, EPA's obligation to ensure that the aggregate production and consumption baselines are not exceeded is a condition on EPA's authority as it carries out all of its other assigned responsibilities under the statute. Right, so this is your rewards of constraints versus authorization argument. That's right. So ensure there only means to make certain that other authorities are not seen to trump the core phase-down authority. It doesn't give any other compliance authority. Yes. I think that's especially demonstrated in all of the cross-references section of E2B that you see throughout the Act. Every time E2B is referenced, it is as a constraint on the agency's authority. It's not an affirmative grant. I didn't entirely follow that. It's not a constraint on the EPA's authority. It is putting a duty on the agency to act, which is what the Act, generally the AIM Act, is doing. It's putting a duty on the agency to constrain the market, to constrain the actor subject to the regulations. So the idea that it limits EPA, I just, that's sort of hard to follow. I think we are talking a little bit about the same thing here. If you look at, for example, section E2B Romanat 1, this is where Congress has told the agency, you need to do this through granting allowances. And it says, you have to, it tells EPA, you have to grant allowances in conformity with the stadium. And what it's saying is you can't grant more allowances than we've authorized under the Act. Right. And similarly, E5B Romanat 3 authorizes EPA to allow export-oriented production in excess of a person's allowances, but only if it wouldn't violate E2B. So it's sort of, if we're ahead of schedule, if things are going really well and there's some reservoir, then you could grant more export-oriented production, but not otherwise. I think the violation language there is notable, because if this were a grant of authority, it would be strange to talk about violating E2B. Right. It would be strange to talk, if this was a grant on EPA, it would be strange to talk about a violation. And the same goes for section J3. I think that's important, because it creates an exception to E2B. And again, this is a kind of exception proves the rule situation. By expressing, authorizing EPA to deviate from its duty under E2B, that proves that the section is conditioning EPA's authority. It's not sort of conferring it more. Well, it's reconciling the different provisions. But I guess what's not clear to me is why, if that's the only function of the shall ensure, it doesn't say that. Because given K and given that it's the only compliance provision in the Act, it seems like maybe that's a plausible reading. But it's not the reading that the agency here took, and Congress does not clearly limit its function in that way. Well, it's a clever argument, and I think I really do follow it. But I'm not sure that it goes as far as implying that E2B is a limitation. I understand that, and I think that sort of draws us back into my prior arguments, which is to say Congress did give express rulemaking authority in all these other places. And it did give the agency enforcement authority in section K. And so it's those express grants of authority, and that's what really matters here. Congress dedicated tools to deal with these issues. EPA needs to use those tools. It's not able to simply ponder compliance methods out of thin air. And again, just maybe push a little bit further on my textual argument with respect to the shall ensure language. This is how the Act has used that language. Every time it used the word ensure, it used the word ensure three times. Every time it's not a grant of authority, it is a condition on the agency. It's a duty on the agency. It doesn't give a broader authority than otherwise. Well, again, it's a duty, and it's a duty to act consistently. That's stated. Yes, that's right. Yeah, I've gone way over my time. All right, we'll give you one second. I think just one question. I look at E2B. It looks like math one. Yes. It looks like it's telling the agency, you need to use this math one. Absolutely. No more, no less. Do you agree? I agree. As the government. Okay. Thank you all. Thank you. Mr. D'Angelo. Mr. D'Angelo. Good morning, Your Honor. My name is D'Angelo. I'm the Commissioner of Warrants and Industries. Your Honor, even if EPA did possess the authority claims, this would still satisfy the cylinder ban. Banning non-refillable cylinders is not rationally connected to the one and only reason EPA claims to have promulgated this ban, and that is to address HFC smuggling. EPA's final rule in brief, they just claimed quite a few times that it bans non-refillable cylinders to address refrigerant smuggling. There's a reason why they think so, of course, and I think it helps understand the rulemaking and why there appears to be such a mismatch in the record between the rationale and the record. When EPA proposed the cylinder ban, justification was much more about emissions from the venting of residual gases that remain at the bottom of the cylinder, or heels, so heel venting. That's why so much of the rulemaking record in nearly all of EPA's analysis is focused on heel venting rather than smuggling. That's why the discussion of the connection between cylinder bans and smuggling based on a memo that EPA drafted and added to the docket two weeks before finalizing the rule. It's also why the presumed reduction in heel emissions are the only benefits EPA calculated in the regulatory impact analysis, and they are massive. Thirty million metric tons of emissions reduction due to heel venting alone, zero, attributable to smuggling. Billions of dollars in social benefits from eliminating heel venting, and zero from smuggling with venting. The regulatory impact analysis is 50 pages talking about the cylinder ban, all of it talking about venting. Smuggling comes in on the very last line and says, as noted in the preamble, the provision is an important compliance tool. This looks like a record for an anti-venting prohibition. But the final rule is clear on this because EPA says venting of heels was not, quote, a part of the fundamental rationale related to the authority upon which EPA is relying. And the question is why be so emphatic about narrowing your justification for the cylinder ban? I think the answer relates to what Mr. Warrick was talking about from the statutory side. What we believe the government's statutory discretion may be, even EPA's interpretation of E2B can't construe cylinder venting prohibition as within its claim authority to enforce the AMAX production and consumption limits. But this left EPA with just square pegs and round holes, a mismatch between the record that it- Why isn't it consumption limits? Because consumption is not defined to include venting from- Throwing away. Yeah. And EPA does not suggest it. So that's why we have a mismatch with this rule. And I'll describe a couple ways that that sort of plays out. For one, it's utterly inconceivable that EPA could look at the European Union cylinder ban and pull that out as an example of why we could be banning non-refillable cylinders as a proven track record of success, including the agency there. EU is a model not to be emulated. It is a model to be avoided. And there's reasons for this. The EU cylinder ban was not put into address smuggling because it was never intended to address smuggling. EU banned non-refillable cylinders in 2007 for the purposes of prohibiting venting. And all of the records that EPA can cite through the administrative record, they're all showing that venting smuggling is a massive crime in black market. So EPA suggests that banning non-refillable cylinders will be an anti- because, quote, they provide an easy mechanism for the flagging of a legal HSE activity on the board. But this is not the case, and we saw this was not, this has not been the case in the EU because EPA's cylinder ban bans the use of non-refillable cylinders for the 18 regulated substances under the AMAP. So at the border, there is a perfectly legal reason why a customization would see non-refillable cylinders coming by from the end and refillable cylinders coming in. It is not a means of discerning at all whether that there's an illegal substance in there. Other substances are in disposable. But they would presumably have to be labeled correctly. And it is a big enforcement tool if they were labeled incorrectly. It raises the likelihood that there could be enforcement. And if they're labeled correctly, then it's easy to see. But none of that has to do with the cylinder design, Your Honor. But doesn't it? I mean, if it's easy to see what's there, you know, it's a piece of information that's useful and has been not fail-safe in other countries, but actually useful in very respect in other countries according to this record. Your Honor, I don't see that in the record at all. In fact, so it's not just the other substances that come in non-refillable cylinders, it's other refrigerants as well. It will always be the case in order to determine that cylinder and the substance in it are legal, one would need to look at the substances on the inside. So customs agents would have to either check the label to see, is this one of the 18 or the hundreds of other refrigerants that are on the market or adhesives or helium or otherwise. And in some cases, they would need to test. Because that is another obvious way of circumventing that they would just have a label that does not accurately identify what is in the cylinder. So looking at a cylinder doesn't tell you anything about whether that is a legal import or a legal import. But looking at a cylinder together with a label is very, very helpful, no? Well, if the label is what is providing the visual cue to the customs, and Your Honor, even if there was a suggestion that, or a reasonable basis by which EPA could say that banning non-refillable cylinders will provide the visual clue, there's evidence in the record that says, this is so easily circumvented by smugglers who just would say, oh, they were drawing an enforcement scrutiny based on the use of non-refillable cylinders, we used refillable cylinders. The high value of the refrigerant makes it no barrier at all. That's the quote, no barrier at all to switching to refillable cylinders. There's also evidence that it does, in fact, deter smuggling, because it's heavier and harder, and the value of them would then have to go back overseas. I mean, part of what Congress is about here was encouraging a domestic market, and certainly the refillable cylinders is anti-smuggling from major producers overseas and focusing on legal production. Yes, Your Honor. Dramatically, no? So what the record shows, this pulling post article, it shows that the refillable cylinders are not being used as refillables. They're one-way. The smuggling transaction is still a one-way transaction. Smugglers are not setting up refillable return and refilling programs. So that's why it's no more traceable. I'm sorry. I apologize for interrupting. I just had a couple of questions I wanted to make sure to ask. Part of your argument is that the EPA can't rely on personal communications or has to place them in the record, and EPA relies on Sierra Club versus CASEL, which requires only that the agency summarize in the record the significant points that it's learned during oral communications if they're of central relevance to the rulemaking, and it seems to me that EPA has done that here. So is there a reason that the CASEL standard is no longer applicable or that that is inadequate, the summarizing of the conclusions of the oral communications that it had with Australia? Yes. Thank you for your question. So there's two responses to that. One, EPA bases this on conversations with the counterparts of the five jurisdictions that have bans on refillable cylinders. There's not even a citation to four of them. There is only one citation for Australia, and it's not connected to that statement. All of the other instances, and these are broader than just the instances of just related to, you know, whether there was a reason to believe that canning cylinders have a relationship to smuggling. They are simply the identity of either the person, the way that person works, and the date of that conversation. So that is no more a summary of that conversation than the caption for this case will be a summary of the holdings of this case. We don't know what was said, what was asked, what was the context, whether they presented the information to EPA in a range, and EPA took something back. We know the conclusion EPA drew from it, but there's nothing that can be construed as a summary of any of those communications, and it doesn't pervade this entire record. But those are footnotes to text that they support, so there actually are statements. I mean, it's more like a case citation in a brief where you make a statement of law, and then the footnote is just the case citation, but that doesn't mean that you haven't actually given the key reasoning or the key proposition that was discussed in the case. Your Honor, I believe there could, you know, in many cases for these questions, there could be a distinction between what was communicated and the conclusion that was drawn. Well, that's always true if you don't have a verbatim transcript. I mean, that's why I'm asking about the causal point, because it seems like the standard allows some amount of flexibility, and I understand that it means it's harder to scrutinize. Yeah, we don't know the expertise. We don't know how to weigh that, and in most of these cases, EPA is elevating that information above the actual hard data that's submitted by the commenter, and that is a reasonable basis for this rulemaking as well, Your Honor. Oh, and I know you're talking about arbitrary and capricious and not about the statutory argument, but you don't – your client does not object to the QR codes, am I right? We have not, Your Honor. From a manufacturer's perspective, my client manufacturer's, stamping a QR code on a cylinder is not burdensome. And what – so you don't have a position, or do you, on the authority for the QR code? We don't have a particular position on that. We've not articulated that. So you think there's no statutory authority? I don't think there's statutory authority for that either. All right, thank you. We'll give you a couple times in reply. Mr. Williamson? Good morning. May I please report? David Williamson for RMS Georgia, which is known as Police Refrigerant, and I'll be talking about whether blends are part of the allowance program. And the non-delegation issue. The AMAC created a cap and trade program that pays out certain chemicals, known as HFCs, in favor of new chemicals patented by large U.S. chemical companies. Congress specifically listed 18 of those chemicals in a table at SOSEX and C1. That's at a ten of two. This is going to get a little complicated, so if you want to follow along, I think the addendum, even though it has small type, is quite helpful. Critically for this case, the statute prohibits EPA from listing blends in the table for purposes of the allowance program only. Despite this explicit listing prohibition, EPA says it can require allowances for blends. EPA is reading the second part of the savings clause at subsection C3E2, refers to that as E2, in a way that upends the first part, the prohibition on adding blends to the table. E2 reserves EPA's authority under the AMAC, but that begs the question of what authority does EPA have? EPA says that subsection E2, that's at addendum 3, gives them the necessary authority to regulate blends, even if they're not listed on the table. But subsection E2 is the requirement to have an allowance for a regulated substance, and that's a legal duty that Congress legislated, not an authority that Congress delegated to EPA. EPA does have certain authorities under the AMAC, however, so the reference to authorities in the savings clause makes perfect sense. Chief among those authorities is at subsection I of the statute, which allows EPA to phase out HSDs in particular end uses, such as new refrigerators and new air conditioners. But EPA has to make factual findings in order to invoke that authority, unlike in the allowance program where Congress chose to keep chemicals that are subject to the trading program. The factors that EPA looks at to use that authority are things like affordability, things like availability of substitutes for the old HSDs, and safety. In fact, some of these substitutes for HSDs are flammable, so that's a problem in your kitchen, in your refrigerator. Can I ask about the science, which I usually need a lot of help with? When an HFC is, when there's a blend, and the blend includes an HFC, does the HFC have the identical chemical composition that it would have outside of the blend? Your Honor, there was a lot of sort of sniping back and forth in the briefs on this point, but I don't think that the parties actually disagree on the fundamental content. The blend is a blend of two HFCs that comes together in the blend. And it has, the key is that the blend has different physical and performance properties. So there's not a chemistry or a molecular interchange. We've talked about whether this is like a cake of flour and sugar together. I'm doing a cooking analogy. Well, I have to, the one that I think is the closest is it's a... It's a what? Mayonnaise. No, no, no, please, please, no. The cooking analogies confuse me more than they clarify. So what about if they think about it as a bag of marbles? There are blue marbles, which are the regulated HFCs, and any other color is not regulated. And you put blue marbles into a bag. And the way I understand the savings provision and the ban on regulating blends is that the EPA cannot require allowances for the volume of the entire bag. It can only require allowances that correspond to the quantity or the volume of the blue marble. And that is the distinction that, to my reading and in the briefing, made sense to me as in the savings clause, allowing EPA to regulate a regulated substance within a blend. So the fact that the blue marbles have been put in a mixed bag doesn't deprive the EPA of authority to regulate the blue marbles, even though they can't list bags of marbles as regulated substances and they can't use an allowance, require that allowances be used for the whole bag quantity. Yeah, sure. I haven't thought of marbles analogy, but let's use that. That is EPA's interpretation. That is what EPA wants to do. But that approach is inconsistent with the text that Congress actually wrote. What Congress said is there's a list of 18 substances. There can be a color of marble. And it said you cannot add blends to that list. The function of the list is to define what chemicals need allowances to be produced or to be imported into the country. So blends can never be on that list. I took their next question to be a science question and your question to be a statutory interpretation, or your answer to be a statutory interpretation. Just get what the statute says. Is the marbles, blue marbles analogy a good analogy, an accurate analogy? Or what's going on? It's not a good analogy, Your Honor, because I think the bag of marbles is cheaper. That once the marbles are in a bag, it's a different product. And Congress said do not add that product to a list. Again, you're kind of like, you're labeling it differently than the EPA labels it, and I get that. Maybe you're right about how to label it or not. But if one of the 18 blends is blue marble, and you put that blue marble with a bunch of other marbles that are not listed, I said blend, I meant HFC. If one of the HFCs is a blue marble, you put that blue marble in a bag with a bunch of marbles that are not regulated, is that in any way different than putting a regulated HFC in a mixture of other unregulated stuff? From a chemistry standpoint, perhaps not. Okay. But importantly, from a statutory standpoint. I understand you. I mean, that's helpful. So let me ask you, in your statutory argument, if there was a blend that's the only contents of which are two or more listed substances, your position is that allowances cannot be required? The plain text says that... Yes or no?  It cannot be regulated. It cannot be added to the list. Pardon? Unless it's added to the list. It cannot be added to the list. Right. I understand. It cannot be added. So 100% is regulated substances, but they're mixed. Then EPA lacks authority to regulate that. Right. And a blend that is 95% listed substance and 5% something inert, also not subject to regulation because it is not on the list, it can't be on the list, and it differs from what is on the list. Not subject to regulation, Your Honor, and EPA is troubled by that, but EPA is assuming the premise that Congress wanted to phase out blends, but there's nothing in the statute that indicates phasing out the blends. I don't read their reading. I don't understand their reading that way. That Congress is giving credit for blends if they're using non-listed substances in large part, then it's going to be way cheaper in allowance terms to manufacture a blend than to manufacture something that's old school, listed, 100% HFC. I'm not sure that's the case, Your Honor. The blends are different products. They have different chemical designation. But that's the position I understand and registered that that's the position. So now that I think I understand your statutory position, can you explain again your interpretation of what the tail end of the savings clause speaks to? Because it would seem to say you can still regulate the blue marbles, and I hear you saying, no, not when they're in a blend. Yes, Your Honor, not for purposes of the trading program. For other authorities, yes. But one has to reconcile the words that Congress chose in the first part of the savings clause, which is do not add blends to that list for purposes of the trading program. I need to say, if EPA's interpretation or their desire to regulate all HFCs and all blends were the case, I have not been able to figure out why the drafter would not have simply said, don't add blends to the table for any purpose. And then EPA can use its authorities to regulate situations where there are substances dependent. But that's not what Congress said. You cannot reconcile EPA's interpretation with that precise language. And again, it's a very, if you follow the syllogism that there's a table, the blends cannot come into that table for purposes of the trading program. All that means is that blends cannot be subject to the allowance program. But there are other authorities in the act that allow EPA, if it meets certain points of availability, of safety, of acceptance by local codes, can address those blends in other ways. So it's not that blends entirely escape regulation under the act. Let me ask, an HFC within a blend still retains identical chemical characteristics to an unblended HFC? That's a fundamental point, is that the chemicals are still identifiable. You use a mass spectrometer. But that's how you figure out what's in any material. A piece of stone, you can figure out what the chemicals are that make it up. But the blend takes on new performance characteristics. You cannot use blends of substances. And people don't manufacture blends just to sort of fit the HFCs into the blend. If there were a situation where that was being done for convention purposes, that could be dealt with. But what if you blend HFCs? Is there a chemical reaction? There's no chemical reaction. But there is a mixing that allows that substance to act in different ways than its component parts. I know you don't want me to use the mayonnaise, but I think it's so apt, is that you would not just spread like chopped up egg and oil on your fish and fish. Mayonnaise is an entirely different substance once it's blended. It's physically a different substance, even though you could, if you had the right equipment and time and energy and money, you could potentially unmix it, but extremely difficult. I was wondering about this in reading your brief, and I think in your comment you referred to feedstocks, and EPA responded and said, no, we're not really talking here about feedstocks, because if I'm understanding correctly, feedstocks are transformed when they're used, whereas in a blend, EPA has asserted, and you have not disagreed, that the original regulated substance is still discernible. It has not transformed. So I guess my question is, is the identification of the regulated substances as feedstocks in any way critical to your position? Well, the statute doesn't use that term. The term is used generally in the industry in situations that doesn't necessarily require a chemical combination, right? Walker's going to hate me for this, but in mayonnaise, you could say that feedstocks of mayonnaise or eggs and oil, it doesn't, that term itself, I've never understood that term to require a chemical reaction. And in the industry, I think it is... The emulsification is not a chemical reaction? No. Well, no, it's not in mayonnaise. I don't believe it. But, Your Honor, I want to emphasize, because you're focused on it, these chemicals are given different, what we call, ASHRAE numbers. They are different chemicals. In fact, in order to produce and manufacture one of these blends and put it into an air conditioner, one has to approach EPA under 608 of the Clean Air Act regulations and actually get approval because they need to see that that new blend chemical is going to function correctly in the refrigerator and not destroy the refrigerator. So EPA itself treats these as different substances. I'm not sure the feedstock issue is positive. We did not intend it to be. We'll give you a couple of minutes to reply. May I address the non-delegation? No. No. Then reply. Thank you. Thank you. Mr. Coughlin? Good morning, Your Honors. May it please the Court, I'm Andrew Coughlin on behalf of the responding United States Environmental Protection Agency. With me at the Council table is Karen Bianco from EPA's Office of General Affairs. Your Honors, Congress asked the EMAC to phase out production and consumption of HFCs. Can you speak up a little bit? I'm sorry, Your Honor. Much better. You might see if you can make him closer to your face. I don't know. How's this? Is that better? It's way better. Okay. You look uncomfortable. I'll manage. Raise the podium, too. That might help. As high as it goes, I'm afraid. Your Honors, Congress passed the EMAC to phase out consumption and production of HFCs. It delegated to EPA the responsibility to implement those phase-out levels. Petitioners' reading of the EMAC would seriously undermine EPA's authority to carry out statutory       Your Honors, Congress asked the EMAC to phase out production and consumption of HFCs. Can you speak up a little bit? their responsibilities. Their statutory arguments are an option in the EMAC's text and purpose and should, therefore, be rejected. I'd like to begin, if I could, by addressing associations' petitioner statutory arguments, which concern Section E-2-B of the EMAC. In that provision, Congress gave EPA a clear command to ensure that phase-out limits are achieved. I think that clear command needs to be understood to carry with it authorization to implement the actions necessary to carry out the command. EPA knows that when the HFC phase-out limits in the EMAC take effect, that there is going to be an increase in illegal HFC activity in the United States, and EPA knows that that increase in illegal HFCs will threaten, will jeopardize, achievement of the phase-out limits in the EMAC. So in order to carry out its statutory function, EPA adopted measures to identify and to prevent illegal HFCs, thereby ensuring that HFC production and consumption takes place within the framework of allowances that Congress provided. Specifically, and it's relevant here, EPA created a container tracking system in order to know if a unit of bulk HFCs in this country actually corresponded to a required allowance, and it also prohibited the use of disposable cylinders, because disposable cylinders are going to be the most attractive factor for smuggling, because prohibiting the use of disposable cylinders provides a valuable interdiction benefit. Can you speak to – oh, go ahead. Go ahead. Okay. If we're not with you on E2B, but there's some other part of this statute or maybe even another statute that allows you to do the QR code regulation and the cylinder regulation, what do we do as a court? Well, I think EPA explicitly relied on this section of E2B authority. If the court disagrees with us on that statutory issue, then I think the appropriate course would be to remand the agency. And this is pivoting a little bit, but the cost of the cylinders is debated. I didn't see much or anything about the cost of the QR code. Do you know what the cost is? There isn't an explicit discussion of cost of the QR code tracking system in the preamble to the final rule. There are materials in the record, the regulatory impact assessment, that assess cost of data requirements under this rule, including the QR code tracking system. What are they? I don't have off the top of my head, Judge Walker, the exact figures. My recollection is that the total cost of data requirements, once fully phased in, that is including the QR tracking code, would be something on the order of $15 million thereabouts all part in cost per year on regulated entities. But again, I just want to stress that I'm going through memory here. That's okay. I appreciate it. And if we think cost informs when major question is triggered, do we separate the QR code cost and the cylinder cost, or do we look at them together? Well, I think if you're going to do a major questions analysis here, it would be fair to look at the costs separately. I mean, these are different regulatory provisions. They're challenged separately. And I think we, in association, practitioners agree that they would be severable. If I could step back for a second and perhaps address what's behind this, I think that to jump to major questions here based on cost would be, I think, a step too far. I mean, if you look at the West Virginia case, for example, you've got costs that are, I think, two or three orders of magnitude greater than the costs here. I think just about every regulation as an agency issues is probably going to have compliance costs that run into the millions of dollars. I think there was one of the cases, I think it was NFIB, one of the cases from last term, and the cost there was, I think, single digit billions. Billions with a B? Billions with a B. So much less than West Virginia. But enough that the courts seem to think it's expensive enough to trigger, maybe trigger a major questions. So maybe once you get to billions with a B, you're talking major questions. We're still well short of that? Well, they say you're at $2 billion on the cylinder. Well, I think we dispute that. You're saying $400 million? In aggregate over the course of, I believe, until 2050. And so on an annual basis, about $22 million a year is the number that the agency came up with on the cylinder ban. But federal major questions as well, I mean, I think there are a number of other factors that just aren't present here that are present in those major question cases. This is not an example of the agency discovering some sweeping authority in a dormant statutory provision in a long-extant statute. I mean, this is the first rulemaking that EPA has ever done under the EMAC. I think that places this on a pretty fundamentally different footing. I think even the Association of Petitioners haven't really expressly invoked the major questions doctrine. They cited some cases, but I don't think they've gotten there. I don't think this court should either. And in terms of... I mean, one of the things they have pressed on is, as West Virginia referred to it, whether it's the agency's bread and butter. And petitioners have said, look, these are Department of Transportation, cylinders, Customs and Border Patrol is really the agency tasked with figuring out how to detect smuggling or illegal importation. How do you respond to this? Is this the bread and butter of EPA to figure out what compliance measures along these lines are going to be helpful? I found that argument a little bit puzzling, Judge Fuller, because the petitioners have also said that EPA is well equipped to conduct investigations and to root out illegal activity. And I think that's what EPA is saying that it's doing here in part with this disposable cylinder ban. I mean, the agency knows how to regulate an industrial sector, and it knows, based on the experience of the European Union, that the disposable cylinders are going to be the most attractive vector for smuggling. So I think it's well within EPA's compass to say, look, we've seen what our sister regulators in these other jurisdictions are doing. We've seen how they've used their enforcement authority, and we've seen what tools have been helpful for them. And so we're going to learn from their experience, and we're going to adopt some of those measures as well. Now, is there anything about EPA's expertise as an environmental regulator that well equips it for determining the kinds of containers? And I know there are containers in the pesticide area, there are containers in the biofuels area that are regulated and specified by EPA, but I don't know enough about what that has to do with and whether you have any comeback on the notion that this is just not the real health. Well, exactly to your point, I mean, I think EPA has extensive experience working with Customs and Border Protection, for example, to interdict supplies of other smuggled substances, pesticides being one example. EPA also knows quite a bit about regulating refrigerants, of which HFCs are of one kind. To address a comment that a friend on the other side made about the availability of other types of disposable cylinders and the fact that that might lead to some confusion or undermine the interdiction value of disposable cylinders, I've spoken to the agency about this, and there are chemicals that are transported in disposable cylinders, helium, certain foams, things like that, but the disposable cylinders that are used to transport those are not identical to disposable cylinders that are used to transport refrigerants. That's what we're talking about here. And when it comes to refrigerants, HFCs are the refrigerant that are transported in disposable cylinders. It's not a non-zero number of other refrigerants, but it's, as you put it, a very valuable heuristic for somebody who's an inspector at the port dealing with massive volumes of freight moving in to be able to separate the chute from the goats. Just circling back, in your discussion with Judge Walker, he had asked if E2B doesn't support it, is there no other source? And I wanted to clarify your position on the K1A authority and brief embraces of K1A as And I wasn't sure whether you were walking away from that or... Thank you for the opportunity to clarify that. So EPA relied on Section E2B for substantive authority. Exactly as you put it, Judge Clark, EPA relied for procedural authority to issue regulations on K1A. So the two provisions work together, but when it comes to EPA's assertion of substantive authority to issue the QR tracking code system and disposable cylinder ban, it was relying on subsection E2B. And what about the blank check argument? I mean, we really have to be concerned when something is phrased as generally as it is shall ensure... I mean, in some sense, the entire act is explaining how the EPA shall ensure that only the requisite phase-down quantities are manufactured and consumed. So you have a problem there because there's a lot of specification in the rest of the act. And you're saying, no, that doesn't exhaust what we do. We have other residual authority. What are the limits on that? Let me make a point about statutory context and then let me offer some additional limiting principles on how we understand Section E2B. So I think that the point about context is a fair one. There are specific grants of authority elsewhere in the AMAC, and the command in E2B is a general one. And I do think you have to read that general command in light of those specific authorities. But I think EPA's interpretation of Section E2B does that. EPA understands authority under Section E2B to issue complementary measures that ensure that the specified mechanisms in the AMAC actually work the way they're intended. So if you have the legal HSEs coming into the domestic market, those are not going to be HSEs for which an allowance is obtained. And the design of the AMAC is to set up a system of allowances. The AMAC creates a system of allowances that EPA then phases down over time, thereby lowering the consumption and production levels of HSE in the country. But that phase-down of available allowances doesn't actually perform its intended function if you don't have production and consumption actually occurring within the framework of allowances. So EPA is not looking to its E2B authority as a freestanding authority to just do whatever is necessary to ensure it understands that work in concert with the other more specific authorities that the agency has been provided with under the Act. And I do want to offer a couple of limiting principles in addition to that contextual. I think this is important. And the first one I would offer is that the Section E2B can't be read in any way to conflict with other provisions of the AMAC. And I realize that sounds fairly obvious to say it, but let me give you some examples of how that fashes out. So Congress set phase-down limits in the AMAC. Another way of looking at those phase-down limits is that Congress specified the allowable amount of HSE production and consumption in given years. And I think EPA could not use its Section E2B authority in a way that had the effect of driving down HSE production and consumption levels further and faster than Congress called for in the AMAC. I think another example is the AMAC clearly contemplates that there will be international trade in HSEs. In fact, it defines consumption and including importation of HSEs. I don't think that EPA could, for example, ban all imports of HSEs just because that might help ensure that phase-down limits are achieved. I think that would be inconsistent with the statutory scheme. So you just answered the question I was about to ask, which is, if you're right about E2B, what can EPA not under E2B? But your answer is, well, they can't do under E2B what they're prohibited from doing by other parts of the statute. Okay. Is there anything else they can't do under your interpretation of E2B? Well, I'll give you a couple of other guardrails, I think, on the agency's authority under E2B. The second one that I would offer is that E2B allows the agency to ensure that phase-down limits are achieved. Now, any measure that EPA implements under E2B has to be justified as a means to that end. It has to have a rationale that survives scrutiny and is actually linked to statutory end of phase-down HSE. So I think that limits somewhat the scope of what EPA could do. And then, you know, the third limiting principle I would offer actually comes from K1A. That's the general rulemaking, the procedural rulemaking authority that EPA relies on. And K1A allows the agency to take that regulatory action as necessary to fill its functions under the Act. We think that that word necessary does do some disciplining of what EPA is able to do. I want to be clear, I don't think necessary in that context means absolutely necessary or indispensable. I don't think any regulation would ever pass that test. But I think necessary in that context means something like well-adapted or reasonably well-suited. So there has to be a fit between what EPA is doing under Section E2B and that function that's going under the AMACT. The petitioners use as their parade of horribles something you haven't mentioned, which is I can't remember the exact phrase, but, you know, rail cars and airplanes. Can you require they be fitted out in a certain way or that the rail cars be only of a certain color if they have HSCs in them? I mean, you get the point. What is the principle that limits that? If that would be helpful or necessary in the way you're referring to, it's not in conflict with anything else, as Judge Walker pointed out. It would be justified as a means. You know, are we only looking at the limits of arbitrary and capricious power? Arbitrary and capricious power certainly backs up. I think that the necessary requirement probably does do some work to leave some of those extremely far-flying examples, like painting rail cars a certain color. It's a little bit hard, frankly, though, to answer hypotheticals in the abstract like that. Honestly, I think that's sort of a function of the broad language that Congress used. It's difficult to draw bright lines when the command is as broad as the command in E2B. But what I would say is if EPA has an extremely compelling record that says that there is a certain means of conveyance that is the preferred vector for smuggling and, in fact, 90 percent of the smuggled HSCs that's interdicting are coming over rail, I don't think that there's – I don't think Congress would have intended, having told EPA to ensure that baseline limits are achieved, that EPA has no regulatory authority to do anything in that area. Can you respond a little bit to opposing counsel's discussion of the – I didn't really read their – the record to include this that much, but just explaining why – why isn't labeling alone enough? Why refillable cylinders? Why isn't QR codes alone enough? Why refillable cylinders? Yeah, I think the way that EPA conceived of the measures that it implemented under Section E2B is that they would work in tandem. They can all stand alone, but they complement each other. And I think that the why QR codes, why stickers aren't enough answer is they don't have the same interdiction benefit as the disposable cylinder ban. I think one of the reasons for that is if you can imagine if somebody is going to smuggle and disposable cylinders are available to them as a means of doing that, all they have to do is slap a sticker on that. That's a lot easier than obtaining a refillable cylinder. So there's an impediment that the refillable cylinders ban imposes on smugglers that I think is important. And then if you think about it from the perspective of somebody who's doing an inspection, again, imagine a busy port. There's a lot of cargo. You're having to do inspections on site. You're drilling down where you notice something may be out of sorts. You're not checking every single canister to make sure that a sticker's on it. The sticker might be on the back of the canister, might be on the bottom of the canister. You're not – certainly not scanning every QR code that's on one of those cylinders. So in addition to that ability to do a quick visual inspection, which the disposable cylinder ban does, it gives you a benefit that you don't get just from those other measures that EPA implemented under Section 828. And just on the record and fossil and whether it's still the case, I think there was a policy or a memorandum relied on in Sierra Club versus CASEL. And so what I'm talking about is whether EPA can rely on oral communication so long as it summarizes the significant points made in the meeting. And the footnote in CASEL, this footnote 17, describes an EPA memorandum outlining when and how EPA dockets its meetings with interested persons. And I just wondered, is that still in effect? Is that important for your argument that you've adequately documented those important discussions with counterparts in other countries? I'm not familiar with the exact memo that you're referring to. What I can say is that the way EPA documented its discussions with experts in industry and in other countries regarding the utility of disposable cylinders, the availability of refillable cylinders is consistent with its practices in other regulatory areas. There's nothing out of the norm about what EPA did here. I do want to make one other point, though, because I think part of their objection was to conversations that EPA had not just with its counterparts in other countries, but also with industry experts. This was related to EPA's estimates of how many refillable cylinders would be needed to replace disposable cylinders. And the point I want to make there is, those conversations were documented in the record. The subject matter of those conversations was also summarized in a document that was available for public comment and was explicitly referenced in the notice of rulemaking. And so there was certainly an opportunity for the petitioners here to review what EPA got from those conversations and to respond to it. So I don't think there's any sort of procedural foul there by EPA, certainly not to those conversations with industry. The document that I'm referring to is at JA35. And the reference in the notice of proposed rulemaking is at JA2113. If I can move to the non-delegation issue. Can you name a limit on EPA's discretion over which companies get the allowances? Well, Judge Walker, before I get to the merits of the non-delegation argument, if you just want to address the exhaustion and waiver, if I can. You can if you want. I probably agree with you on the exhaustion point. Okay. If you want to move. Okay. I'll move then to the non-delegation merits, since we all seem to be on the same page here. I can't speak for myself. Well, in that case, maybe I should just briefly summarize what our waiver position is. Section 307D7d, which is the Applicable Judicial Review provision here, imposes a mandatory issue exhaustion requirement. This court has held that statutory mandatory issue exhaustion requirements can't be accepted. And the petitioners did not raise their non-delegation argument in comments. Only those objections that are raised with reasonable specificity in comments are properly with the court. It did not raise that. Therefore, the issue is waived here. But does the exhaustion issue, does the exhaustion requirement even apply? The issue is a little bit novel in that the objection is not really to the regulation. It's to the statute. And if the purpose of exhaustion is raising something to give the agency an opportunity to address it, there's nothing the agency can do if the statute contains an unconstitutional delegation. So I haven't seen a case like this saying that exhaustion applies, not just to a constitutional issue, but a constitutional issue trained on the statute, as to which the agency really doesn't have an opportunity to respond. For example, it would be one thing if the statute didn't ensure due process, but the agency could beef up its process. Or, you know, if there was some amendment problem with the statute, but the agency then regulated in a way that was clearly viewpoint neutral. Here, there's really not... It's hard to see the utility of imposing an exhaustion requirement here. And I just don't know if there's authority doing it in a similar situation. Well, I think three responses to that, Judge Bullard. I think the first thing I note is while their objection is to the constitutionality of the statute, the reason that choice petitioners are in this court right now is because this court has original jurisdiction to hear challenges to actions by the EPA administrator. So, they're challenging an action by the EPA administrator, even if their objection is on some constitutional grounds. That's the first point I would make. The second point that I would make is that I'm not sure it is completely pointless in this context to waive, to the extent this court even could, the exhaustion requirement because, you know, I'll grant that there's nothing EPA could do if there is a non-delegation problem here, but agencies that administer statutes know something about the statute. They administer. And if somebody wants to raise a non-delegation problem in comments, it's at least conceivable to me that the agency could respond to that comment and explain to the commenter how the statute works, where the principle apply, the PF guide agency's discretion, and why there's no non-delegation problem. So, it seems at least possible to me that giving the agency the opportunity to respond to the comment might winnow that issue and spare the court from having to decide this And then the third point I make, Judge Fullerton, this is perhaps the most important one. I think the first two points are certainly second. One, perhaps academic, because this is a mandatory exhaustion requirement that's in statute. And the authority I give you to the proposition that structural constitutional claims are not subject to some special treatment under a mandatory exhaustion requirement that is in statute is funding the U.S. Department of Agriculture, which is a case that we cite in our brief. The reasoning is on all fours here. This court explicitly held that the structural constitutional claim that is issued there, which concerns dual level four cause removal protection of an ALJ, did not warrant special treatment because there was a statutory exhaustion requirement that hadn't been satisfied. That issue was not before the court. So, turning back to your question, Judge Henderson, perhaps on the merits of the non-delegation question, I mean, I think what non-delegation requires is an intelligible principle. I think we've got several intelligible principles here that cost muster under the test. And you have here Congress telling the agency what to phase out. HSE is telling them how quickly to phase out those HSEs. Telling them what mechanisms to use to phase out HSEs. It's the allowance system telling the agency who to give priority allowances to and who to temporarily inflate from the phase down of the availability of allowances. We think in the statute also telling the agency with some reasonable clarity who to give those allowances to. Now, having said all of that, I think Congress under non-delegation doctrine could certainly leave that to the agency to decide who among the pool of people who use or produce or consume or might reasonably produce or consume HSEs to give remaining allowances to. I think that falls within the scope of allowable agency discretion. Certainly within the bounds of constitutional separation are released in that universe of allowances, that subset of allowances. There's no limit on EPA's discretion. Well, I think that there is no congressional guideline on EPA's discretion. Of course, EPA's discretion in this area is going to be bound by general principles of arbitrary and capricious review. And I think, you know, arbitrary and capricious review is a perfectly fine tool to police the kinds of decision making that EPA makes in this area. I think courts are well equipped to determine if EPA can. Would that break new grounds in non-delegation jurisprudence? I mean, it's already the case that almost any delegation passes the current test for a non-delegation inquiry. And then we'd be going even further than that and saying the statute itself needs to have no intelligent principle, at least for this subset of allowances, so long as the APA provides some limits of discretion. No, I don't think that's what you would say in this case, Judge Walker. Can I just get a clarification? Because I may have misread the statute. But I thought that the statute, and we're talking about the general pool that isn't more than, I mean, actually, you know, patronage or punitive or random, you know, assignment. But I thought that the statute required EPA to consider historical consumption rates and that, in fact, the allocation of the general pool reflects actors in the market. Certainly, Judge Blair. I mean, when EPA set the consumption and production baselines, and those consumption and production baselines determine how many allowances there are, it looked to historical practices by HFC producers and consumers, and that was how it developed the allowable levels of HFCs and how it determined how many allowances would be available. But you don't take that to also guide the assignment? The historical patterns of manufacturing consumption? That is how EPA elected to allocate allowances was based on historical patterns of consumption. I don't think that choice was compelled by the statute. But not also guided? I mean, we're talking about delegation. So we're talking about is there any intelligible principle that would prevent my slush fund parade of horrible? Yes. You know, I think what we see in the statute, the intelligible principle that we discern is direction to allocate those allowances to the pool of companies that produce and consume HFCs or might reasonably assume to do so. And how you allocate within that pool, I don't think we think is something that the statute speaks to. We think that that's something that EPA did on a reasonable basis here by looking at those entities' historical consumption. But to turn back to your point, Judge Walker, I mean, I think it's a non-delegation. You have to slice and dice the statute into such small parts before you can find something that you lack an intelligible principle for, and I just don't see that as what the courts use non-delegation doctrine to do. It's really the police at a very high level, whether something crosses some separation of powers line. And I don't think it would break any new ground to hold that this does not run afoul of that problem. I see a comment. I'm judging your statement. I think we got to the bottom of, does the chemical composition of the HFC change when it's in a blend? And I think your opposing counsel conceded, no, it does not. You agree with that concession, I think, and you could maybe point me to something in the record that supports it. Yes, certainly, Judge Walker. I think if you want to see a record site for discussion on this point, I'd refer you to Joint Appendix 1110 and 1112. And the other point I just noted, I realize we're sort of distinguishing between scientific questions and statutory questions. What I'd note, though, is that the statute defines regulated substance by reference to the molecular structure of the regulated substance. To the fact that a regulated substance in a blend, we all agree, maintains its molecular structure means it is still a regulated substance, even though it's a particle. Because the 18 or however many listed regulated substances are like H2O and NaCl and CO2. Precisely. I also had a share collapse under me. I also had a question about the blends and the treatment of blends. At page 32 of your brief, you say, as a practical matter, it may be true that under the approach in the framework rule, the number of allowances required to import the regulated substances within a blend might be equal to the number of allowances that would be required if the blend itself were designated as a regulated substance. And given our discussion of blue marbles and mixed bags, I just wanted some clarification of what you're referring to there. So the scenario we're referring to there, to use your example, blue marbles and red marbles and bags, is a blend that consists entirely of blue marbles. If blue is one regulated substance and red is another regulated substance. So I had also had a question for opposing counsel about that. So I think the difference there would be if you had, let's say, the bag contains blue marbles that are regulated substances and green marbles, which are not regulated substances. So I think what we're saying is the practical effect of not listing a blend means that you don't have any allowance requirement for those green marbles, only for the blue marbles. Thank you. Thank you, Your Honor. Mr. Worth, why don't you take two minutes? Thank you, Judge Anderson. Judge Fuller, I was surprised by the government's answer to your questions about K1A, because that section doesn't really appear at all in their brief, and it is not the basis that they relied on in the final rule. I think, you know, this is K1A, not general rulemaking and boarding. Otherwise, why would Congress, in many of their provisions of the Act, specifically require or authorize rulemaking? If all the government needed was K1A to do whatever it wants, it just simply doesn't make sense. And I think, you know, one way to know that this is not the way that K1A operates is with some historical context here. It's helpful to know that this is not a new issue. Smuggling is not a new issue. Prior refrigerants were phased down in the same way, and smuggling was an issue in the same way, and there was extensive enforcement. And Section 301 of the Clean Air Act has the same sort of necessary and proper language, but to my knowledge, there's never been an instance where the EPA has relied on this sort of necessary and proper rulemaking in order to come up with a full new enforcement scheme. And I think that's really telling here. Well, they do. I mean, the reason that I identified it as a source is because they do in their brief, I think it's in a footnote, but they do identify the K1A. Oh, well, maybe. I'm sorry. My apologies. But I do think it is important to know this extra context, which is that the Clean Air Act has this exact same necessary and proper language. I think that it is coming from, and it is normally used in order to facilitate the administration of the act in more gap-filling ways, not to create a full new enforcement scheme. And I think that's really important. And as we said, I'm sorry, my time has expired. May I have just a moment more? Just for your benefit, it's page 53, note 14. So Section K1A does provide EPA with general procedural authority to promulgate the rule, and they're relying on the substantive authority under E2B as the basis for this kind of rule. I understand. So I think all of that then goes back to all of our arguments. E2B obviously does not give them that authority. But putting that aside, I think the challenge for language in E2B, it really is not this general reservoir of rulemaking authority for anti-circumvention. And then, Judge Walker, you mentioned the major question. I don't think that we even need to go that far, because this sort of elephant-in-mouse-hole problem, it's there regardless of whether it's a major question or not. The EPA did not provide vast enforcement authority in the words of Staff Shalhush or the EPA enforcement authority in other provisions of the Act. And that's where we need to – that's where EPA needs to find its authority. Finally, I just want to touch up on one thing about the QR code mandate. And that's to say that even if EPA does have labeling authority under Section 114 of the Clean Air Act, just to be very clear, EPA does not rely on that authority. We don't think that the QR codes are labeling in the sense that it would be covered under the Clean Air Act. To be very clear, that's not the authority that they're relying on, and I think you'd have to remand the agency on that point if they wanted to try to rely on it. And then just very quickly on arbitrary and capriciousness on the QR code, because my co-counsel is not interested in that issue. I just wanted to say briefly that we put into the record all sorts of ways that QR code is simply not going to work because these labels are going to get scratched off. They're not going to be visible. There's all sorts of reasons why it can be very difficult to work with them for the people who actually have to deal with them on a day-to-day basis. And the EPA's only response was to push back the implementation date and said the agency, quote, the agency will now have more time to develop an appropriate tracking system. Frankly, it was time to develop that system before they issued the rule, not after the rule. So we would hold them to their requirements. All right, thank you. Mr. D'Angelo, I'm sure you'll take two minutes. Thank you, Your Honor. Non-affordable cylinders are not the preferred vector for smuggling, or at least that is misleading. Non-affordable cylinders are the preferred vector for transporting refrigerants and many other things. To say otherwise, to put it in an analogy, I know it was Judge Walker, I'm sure the data that you showed that people in airports who smuggle drugs in their suitcases are using black suitcases more than any other, right? Because black suitcases are the predominant color for suitcases. Non-affordable cylinders are used by, except for five nations, by 99% of people in the refrigeration industry. So it's not the preferred vector. It does not provide a visual cue to push back a little bit on the visual heuristic. We know it doesn't work because the only data in the EPA's record from the EU that showed it didn't work. And even if a ban on non-refillable cylinders caused customs officials to just start targeting those shipments that they saw in non-refillable cylinders, EPA's record also tells us it is no burden for these smugglers to be able to just switch over to refillable cylinders, right? So if you go to the airport, customs is pulling over everybody who's pulling black bags, smugglers can start using red bags. That record says that. Also, if a visual cue is helpful, why did EPA eliminate a cylinder based on its function, a different function, when all they wanted was a different look? EPA never considered any other alternatives to make it look different. And when they were presented those options for different looks for cylinders, which government acknowledges that different non-refillable cylinders can differ in look, they were provided those options by Worthington, which is the only domestic manufacturer of refillable non-refillable cylinders. And they rejected it out of hand without really even engaging with that. I think this takes me back to what I initially talked about as far as the disconnect and mismatch between the record that the agency has a proposal and the rationale that they singularly relied on at the end. They focused on the, they banned the cylinder based on its function when the visual distinctions were readily available in many other ways. Why don't you wind up? You're over your time. Oh, thank you. That's all I have. Thank you. Mr. Williamson? Without offense, I'm troubled by the marble analogy. And I'll say to Judge Walker that I don't think the chemical reaction point is significant to this statute. But if you were to use a marble analogy, think about it as crushing the marbles and then fusing them together so that it was extraordinarily hard to take apart. I will just say that I don't even need to do this. I mean, I actually think the marbles analogy, contrary to what you just said, is very helpful to me. But you can throw all the analogies out. The statute lists 18 chemical compounds. A blend does not change chemical compounds of the agency. Well, Your Honor, that is correct. It's also correct that it's entirely sensible to only require allowances for the regulated marbles in the bag of marbles. The problem is that that assumes that Congress wanted to regulate the blend. When you work through this, I encourage the Court to try to reconcile the listing proposition. It cannot be reconciled with the EPA's view of the scope of what's being regulated. No matter how sensible it is that once you assume that blends are regulated, you only require allowances for the regulated marbles, not for the other regulated marbles. But that listing proposition means something. It means something that Congress said only for the trading purpose. I didn't just say, don't ever list the marbles at EPA. You can regulate the regulated marbles. I do want to address the delegation and just to say, if the Court finds a jurisdictional defect, we will be back. The rule that we're dealing with now only covered two years, 2022 and 2023. EPA has just proposed a 2024 and forward for the next five years. We are going to raise the delegation in those comments. We don't think there's a jurisdictional bar, but that will be supported. What are their responses to your comments for staging? That goes to the point of, Your Honor, what could they possibly say? We're saying that Congress fails to provide any principle to define the most inevitable. The Holding Council described this as slice and dice, but the delegation doesn't want that. But this is the core issue, at least for my client. Once you have a program to phase out allowances, you dismantle the entire sector. EPA actually proposed an auction as one of the options for structuring the phase-out. If EPA thought an auction was available to them, then their arguments about, well, the allowances can only go to past participants in the market, don't really hold up. But I did want to also, my last point to address Judge Phyllis' inquiry about the historical consumption. Your Honor, the historical consumption data was only used to set up a cap. There's no mention of that when we get to how do you do the phase-out. And there was certainly no individualized consideration of historical consumption in that cap setting. It is all aggregated data on total imports.
judges: Henderson, Pillard, Walker